Filed 6/30/16  In re C.E. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.E., a Person Coming Under the Juvenile Court Law. | B267266 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK05406) |
| Plaintiff and Respondent, | |
| v. | |
| F.E., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn K. Martinez, Judge.  Affirmed.

Cameryn Schmidt, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

M. Elizabeth Handy, under appointment by the Court of Appeal, for minor.

INTRODUCTION

F.E. appeals from the order of the juvenile court at the disposition hearing that denied him visitation with his daughter C.E. (Welf. & Inst. Code, § 362.1.)[1] He contends that the evidence does not support the court's finding that visitation would be detrimental to C.E. The Department of Children and Family Services (the Department) recommended supervised visitation and did not file an appellate brief in support of the challenged order. Instead, C.E. is the party defending the no-visitation order arguing the evidence is sufficient. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Detention*

The family consisted of mother Veronica R., her children Jesse and Grecia R. by another man, father, and C.E. who is father's daughter. Grecia, an adult, has lived with father since she was five years old. The Department received a referral in May 2014, when Jesse was 14 years old and C.E. was 10, indicating that father was emotionally abusing the children. According to the caller, mother and father were " 'having relationship problems.' " Mother and C.E. went to see father, an armed security guard, at work. Father became angry, grabbed mother by the hair, pushed and pulled her, threw her against the car, and threatened to use his gun. C.E. witnessed the incident and cried for mother to get into the car so they could leave. Mother went to the police who granted her an emergency protective order. Mother reported that this is not the first time father has acted physically aggressive or displayed violence.

During the Department's investigation, mother related that father was verbally abusive to her and became increasingly aggressive as he drank alcohol. He would lose control and throw things at her, such as beer cans. Once, as mother was getting out of the car, her scarf became caught. Father, who was angry at Jesse, drove off dragging mother and nearly running her over as the children watched. Father was also abusive to the

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

children. Angry at Jesse for cleaning the garage too slowly, father took the children's dogs and left them where they could not be found. When C.E. cried for her dogs, father called her "dumb-ass" and hit her on the back with his fist. Once, father grabbed Jesse by his shirt and threw him toward the garage to clean it.

Jesse reported feeling "a little afraid" of father because " 'he never knows when dad is [going] to be mad.' " Father would drink on the weekends and became meaner when he drank. Father shoved Jesse on two occasions, the most recent being the day father gave away the dogs. Jesse has seen bruises on mother.

C.E. stated she was afraid of father. She reported that father once threw her dogs away and her cat mysteriously died. Once father got angry at her for crying and hit her on the back with his hand. Sometimes, father would get mad at her for not bringing him a beer fast enough and would throw empty cans at her. C.E. watched as father gratuitously hit mother on the back and kicked her so that she fell off the bed. That scared the child. She has seen bruises on mother from father's violence. C.E. and Jesse did not see father hit the other sibling. But, father called C.E. and Jesse bad names, including stupid and dumb-ass. The name-calling made her sad and scared.

Father denied hitting C.E. on the back or calling the children names. He claimed mother was manipulating the children. A coworker wrote a letter on behalf of father stating that father has always been responsible, and that several times mother has come to father's work place to confront him. The author claimed that mother was verbally and physically abusive to father. An employer at Wilshire Bank also wrote a letter on behalf of father describing him as reliable, hard working, compassionate, well-mannered, and respectful.

The family has a history with the Department dating back to 2000. The parents have filed domestic violence charges against each other in the past and each sought a restraining order against the other. Grecia and Jesse's father reported that mother used to hit and scratch him and then accuse him of domestic violence. Mother claimed that father threatened to use his gun on her. Father claimed that mother came to his place of

3

work and slapped him and threatened to have him arrested.  Father was arrested in 2010 for domestic violence but was released for lack of evidence.

The Department filed a petition alleging that the children were at risk of abuse and neglect because father and mother have a history of engaging in domestic violence in the children's presence; father physically abused C.E. by striking her on the back with his fist and Jesse by grabbing and pushing him; father has a history of abusing alcohol.  (§ 300, subds. (a), (b) & (j).)  The court detained the children from father, released them to mother, and forbade father from visiting or contacting the children.  The superior court issued domestic violence restraining orders, forbidding the parties to harass each other and ordering them to stay 100 yards away from each other.

2. *Jurisdiction*

The jurisdiction report reflects Grecia's statements that she never saw mother hit father.  Rather, " '*He* was the one.' "  (Italics added.)  Father would see mother cry and continue to hit her.  Grecia saw father throw sauce, a beer bottle, baby oil, keys, and plates at mother.  He would break things " 'all the time.' "  Grecia witnessed father hit Jesse twice on the back, pinch Jesse on the leg, and hit him with a closed fist.  She explained that father's drinking increased over the years until he drank " 'all the time' " and was violent.

C.E. stated to the social worker that she is afraid of father and did not want to see him.  She was in individual counseling.  She reported that she saw father attempt to pull out his gun during the May 2014 incident that triggered the instant petition.

Father again denied the allegations.  The Department interviewed two people who have known father for many years and who work where father does.  One reported that father was hard working and respectful.  Both stated that mother was the aggressor and that father often brought the children to work because mother was not around to watch them.

The Department categorized the family at high risk for future abuse because of the parents' domestic violence witnessed by the children, mother's failure to report all of the violence, and father's drinking problem.  Its recommendation to the court was to place

the children with mother and to grant them family maintenance services, and to provide father family reunification services with C.E. As for visitation, the Department recommended that father be awarded visits, monitored by someone other than mother, which supervision could be liberalized by the Department.

   3. *The jurisdiction and disposition hearing*.

During the jurisdiction and disposition hearing, the juvenile court extended the temporary restraining order. C.E. testified in chambers. She confirmed that father hit mother "a lot." Father once kicked mother so hard she almost fell out of bed. Father pulled his gun out and pointed it at mother during the May 2014 incident. Father also hit C.E. on the back or side of her body with his fist. He hit her hard enough and sometimes she would fall. It hurt and scared her. She is mad at father. She saw father hit Jesse. If father asked for beer and they did not cut lemons fast enough for him, he would hit both of the children with a fist. She had not seen father since the referral. C.E.'s attorney reported that the child did not want to have contact with father.

Father denied the petition's allegations. He testified that his relationship with C.E. was "very good" and that it was strange that she would say these things about him. He explained that mother promised to do everything possible to prevent him from seeing C.E.

At the close of the hearing, the juvenile court declared Jesse and C.E. dependents (§ 300, subds. (a), (b) & (j)). Finding by clear and convincing evidence that substantial danger existed to C.E. and that she was suffering severe emotional damage, the court removed her from father's custody (§ 361, subd. (c)) and placed her with mother. With respect to visitation, the court found that contact with father did not pose a risk to C.E.'s safety, but would be detrimental for her. The court listed the detriment factors it considered: (1) C.E.'s age, 11; (2) the "extreme" degree of abuse father exposed her to and perpetrated on her; (3) the experiences she suffered because of father's abuse of alcohol and the way he bullied the family; (4) his failure to show remorse; (5) his failure to take responsibility for his conduct; and (6) his failure to show sensitivity for C.E. The court found that father was a bully who had conducted himself just as he wanted, by

5

hitting the children or mother, using his fists and getting rid of the dogs. The court found it would be detrimental to force the child to meet father who has hurt her and her family, her pets, and had bullied them for a substantial period of time. The court stated that father would need to show that he takes responsibility and makes progress in addressing the issues that brought his daughter into court before he could persuade the court that it would not be detrimental for C.E. to have contact with him. The court allowed father no contact with C.E. until further order of the court. The court issued a permanent restraining order against father to expire on July 2, 2018, and scheduled a judicial review hearing under section 364. Father's appeal followed.

DISCUSSION

Disposition orders granting reunification services must provide for visitation between the parent and child that is "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) It is widely recognized that "[v]isitation between a dependent child and his or her parents is an essential component of a reunification plan, even if actual physical custody is not the outcome of the proceedings. . . ." (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580.) However, section 362.1 specifies that "[n]o visitation order shall jeopardize the *safety* of the child." (*Id.*, subd. (a)(1)(B), italics added.)

The juvenile court here expressly found that visitation did not pose a threat to C.E.'s physical safety "because a monitor can provide safety," but that contact with father was detrimental to the child's well-being. As father and C.E. observe, there is a split of authority over whether section 362.1 authorizes the denial of visitation only on a finding of a threat to the child's physical safety (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1492), or whether evidence of a threat to the child's emotional well-being is enough. (*In re Mark L.*, *supra*, 94 Cal.App.4th at p. 581.) The weight of authority appears to allow a no-contact order based on emotional detriment. (*Ibid.* [emotional harm]; *In re A.J.* (2015) 239 Cal.App.4th 154, 160 [physical or emotional well-being]; *In re S.H.* (2003) 111 Cal.App.4th 310, 317, fn. 9 [well-being]; *In re Julie M.* (1999) 69 Cal.App.4th 41, 50 [emotional harm]; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008 [emotional

6

harm]; see *In re Brittany C*. (2011) 191 Cal.App.4th 1343, 1357 [both physical safety and emotional well-being].) "It is ordinarily improper to deny visitation absent a showing of detriment." (*In re Mark L.*, at p. 580.) "Detriment includes harm to the child's emotional well-being." (*In re Brittany C., supra*, at p. 1357.)

" 'Detriment is a familiar standard in child welfare determinations; but, as several courts have acknowledged, the notion of detriment is at best a nebulous standard that depends on the context of the inquiry. . . . It cannot mean merely that the parent in question is less than ideal . . . . Rather, the risk of detriment must be *substantial*, such that [the proposed action] represents some *danger* to the child's physical or emotional well-being.' [Citation.]" (*In re A.J., supra*, 239 Cal.App.4th at p. 160, italics added.)

Viewing the evidence in the light most favorable to the court's order, we hold the record contains sufficient evidence to support the court's order denying visitation between father and C.E. based on the finding that visits would be detrimental to the child, until father has made progress in addressing the issues that triggered the dependency. For years, father has bullied his family by physically abusing them with fists and objects and belittling his daughter by calling her derogatory names. Father's drinking and ensuing violence and anger scared C.E., made her sad and cry. *She is afraid of father*. Father's repeated and consistent denial that he bullies his family by hitting and throwing objects at them or throwing their pets away, palpably demonstrates his refusal to take responsibility for his conduct and his disregard for his child's emotional or physical well-being. In our view, the record supports the court's conclusion that visits between C.E. and father represent a substantial danger to the child's emotional well-being. Likewise the violence between the parents justifies their mutual restraining orders.

Moreover, C.E. has repeatedly stated that she did not want to see father. "[T]he child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation. [Citation.]" (*In re S.H., supra*, 111 Cal.App.4th at p. 317.) The "child's aversion to visiting an abusive parent may be a 'dominant,' " but not the sole factor in administering visitation. (*In re Julie M., supra*, 69 Cal.App.4th at p. 51.) The juvenile court here considered C.E.'s

desire not to see father as only one of a "variety" of factors it weighed. The majority of factors listed by the court concerned father's violence and its deleterious effect on C.E.'s well-being. Accordingly, the record supports the court's detriment finding. (*In re Mark L.*, *supra*, 94 Cal.App.4th at p. 581 [evidence is " 'reasonable in nature, credible, and of solid value . . . .' "].)

Father contends that the juvenile court erred in applying the preponderance of the evidence standard to its detriment finding because, he argues, the stricter clear and convincing standard should apply to visitation orders made during the reunification period. He relies on *In re Dylan T.* (1998) 65 Cal.App.4th 765, and *In re D.B.* (2013) 217 Cal.App.4th 1080. *Dylan T.* held that "visitation between an incarcerated parent and a minor cannot be arbitrarily determined based on factors which do not show by clear and convincing evidence that visitation would be detrimental to the minor." (*In re Dylan T.*, at p. 773.) In reaching this conclusion, the *Dylan T.* court relied heavily on the statutory provisions for providing reunification to incarcerated or institutionalized parents, section 361.5. (*In re Dylan T.,* at pp. 770-773.) Section 362.1, subdivision (a)(1) however, does not specify a standard for parental visitation. In *In re D.B.*, the juvenile court granted a section 388 motion to terminate visitation *after* reunification services ended. The court in *In re D.B.* recognized its pronouncement was dicta, stating, "*Although we need not resolve the issue*, we recognize that when the focus of dependency proceedings is on reunification, a higher standard of proof *may* be warranted before a court may deny visitation outright." (*In re D.B.*, at p. 1090, italics added.)

Nonetheless, even if the appropriate standard of proof were the more heightened clear-and-convincing standard, on this record we conclude father was not prejudiced. The juvenile court had already made the necessary finding of detriment to C.E.'s well-being by clear and convincing evidence when it ordered C.E. removed from father's custody under section 361, subdivision (c). That statute forbids removal of the child from the parents' custody unless the juvenile court finds *clear and convincing evidence* that, similar to section 362.1, subdivision (a)(1), "[t]here is or would be a *substantial danger* to the physical health, safety, protection, *or physical or emotional well-being* of the minor

8

if the minor were returned home." (§ 361, subd. (c)(1), italics added.) Father does not challenge the sufficiency of the evidence to support the court's removal order. Therefore, under either standard, the record supports the juvenile court's finding that visitation with father would be detrimental to C.E.'s well-being.

We are mindful of the juvenile court's statutory obligation to provide visitation as frequently as possible (§ 362.1, subd. (a)(1)(A)) as "the rights of children in their family relationships are at least as fundamental and compelling as those of their parents." (*In re Bridget R.* (1996) 41 Cal.App.4th 1483, 1504, superseded by statute on another ground as stated in *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1311-1312.) " 'An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children "as frequent[ly] as possible, consistent with the well-being of the minor." ' [Citation]." (*In re S.H.*, *supra*, 111 Cal.App.4th at p. 317.) Yet, in the context of child visitation, the juvenile court must maintain flexibility to respond to the changing needs of the child and the dynamic circumstances of the family. (*Ibid.*) "[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense." (*Ibid.*; see also *In re Julie M.*, *supra*, 69 Cal.App.4th at p. 50.) It is our hope that at the next review hearing the juvenile court will consider whether supervised or therapeutic visitation between father and child might better serve the statutory goal of reunification. Father may always bring a motion under section 388 to modify the no-contact order.

DISPOSITION

The order appealed from is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



ALDRICH, J.



We concur:



EDMON, P. J.



LAVIN, J.